# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LEE HUNT, as personal representative
Of the Estate of SEAN BREEDEN, Deceased,

  Plaintiff,

vs.               No. CIV 15-0233 JB/GJF

NORTH CAROLINA LOGISTICS, INC., a
North Carolina corporation, SANVIL
GROUP CORP., a Florida corporation,
LEONARDO R. CABREDRA-SALGADO,
Individually, and BENITO A. OLIVA, individually,

  Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Atlantic Specialty Insurance Company's Motion to Intervene as Plaintiff, filed November 25, 2015 (Doc. 67)("Motion"). The Court held a hearing on March 7, 2016. The parties have agreed that the Court should treat the Motion as a motion to dismiss Proposed Intervenor Atlantic Specialty Insurance Company from the case. The primary issue is whether Atlantic Specialty, a Pennsylvania corporation, has a right to subrogation to recover benefits it paid to Plaintiff Lee Hunt, personal representative of the Estate of Sean Breeden, pursuant to an insurance contract, after Breeden was killed in an automobile accident in New Mexico. This question requires the Court to determine whether: (i) New Mexico or Pennsylvania law applies to this dispute; and (ii) whether Atlantic Specialty's policies are indemnity contracts or investment contracts. The Court grants the Motion in part and denies it in part. It allows Atlantic Specialty to intervene solely to advance its equitable subrogation argument. Because the Court does not agree with Atlantic Specialty's equitable subrogation

argument, however, it will dismiss Atlantic Specialty from this case.  First, the Court concludes that New Mexico law applies to this dispute.  Second, the Court concludes that Atlantic Specialty's policies are investment contracts and thus do not allow for equitable subrogation. The Court thus concludes that Atlantic Specialty has no right to equitable subrogation in this dispute.

## FACTUAL BACKGROUND

The Court takes its facts from: (i) the Complaint for Wrongful Death, filed in state court November 3, 2014, filed in federal court March 19, 2015 (Doc. 1)("Complaint"); (ii) the Motion; and (iii) Atlantic Specialty Insurance Company's Combined Reply Brief in Support of its Motion to Intervene, filed December 23, 2015 (Doc. 87)("Reply").

Breeden, a New Mexico resident, was the beneficiary of two insurance policies that OneBeacon Insurance issued: (i) a Group Voluntary Accident Policy; and (ii) a Group Basic Accident Policy (collectively, the "Policies").  See Complaint ¶ 1, at 2; Motion ¶ 6, at 2; Group Voluntary Accident Policy for Tyco International Management Company, filed December 9, 2015 (Doc. 76-5); Group Basic Accident Policy for Tyco International Management Company, filed December 9, 2015 (Doc. 76-5).  The Policies provided benefits of up to nine times Breeden's salary upon proof of "accidental loss of life, limb or sight."  Reply at 8.

On the early morning of March 6, 2014, Defendants Leonardo R. Cabrera-Salgado and Benito A. Oliva -- both Florida residents -- were traveling west on Interstate 40 through Guadalupe County, New Mexico in a 2007 freightliner.  See Complaint ¶¶ 7-8, 37, at 2, 14. Defendant North Carolina Logistics, Inc. ("NC Logistics"), a North Carolina corporation with its principal place of business in North Carolina, and/or Defendant Sanvil Group Corp., a Florida corporation with its principal place of business in Florida, owned the truck.  See Complaint ¶¶ 3,

5, 37, at 1, 2, 14.  Cabrera-Salgado was driving the truck.  See id. ¶¶ 39, 41, at 14.  Oliva was sleeping in the sleeper cab.  See id. ¶ 40, at 14.

Cabrera-Salgado experienced mechanical problems with the truck's engine.  See id. ¶ 41, at 14.  He had sufficient time to move the truck onto the shoulder, and the shoulder was wide enough to accommodate the truck.  See id. ¶ 42, at 14.  Instead of pulling off the road onto the shoulder, Cabrera-Salgado allowed the truck to stop in the interstate's right-hand westbound lane.  See id. ¶ 41, at 14.  Although it was "extremely dark, with no ambient lighting from street lights, highway lights, or lights from businesses, houses, or other structures," neither Cabrera-Salgado nor Oliva activated the hazard flashers or brake lights, or deployed warning devices in the roadway.  Id. ¶¶ 43-46, at 15.

At approximately 4:00 a.m., Breeden's car collided with the back of the truck's trailer.  See id. ¶¶ 48-52, at 15.  The impact nearly sheared off the top of Breeden's car and positioned the car in the left lane perpendicular to the direction of travel.  See id. ¶¶ 52-54, at 15-16.  Diana Miller, who was driving a van in the westbound left lane, then collided with the passenger side of Breeden's car.  See id. ¶¶ 55-57, at 16.  Although Breeden was wearing his seatbelt, he did not survive the crashes.  See id. ¶ 48, at 16.  Atlantic Specialty paid benefits on Breeden's behalf pursuant to the Policies.  See Motion ¶ 7, at 2.

## PROCEDURAL BACKGROUND

Hunt, a New Mexico resident, brought suit as Breeden's personal representative in New Mexico state court on November 3, 2014.  See Complaint ¶ 2, at 1.  The Complaint names NC Logistics, Inc., Sanvil Group, Cabrera-Salgado, and Oliva as Defendants.  See Complaint ¶¶ 3-8, at 1-2.  The Complaint alleges four counts: (i) negligence per se; (ii) common-law negligence; (iii) negligence, negligent entrustment, and lease liability; and (iv) respondeat superior liability

and liability for negligent hiring, training, supervision and retention.  <u>See</u> Complaint ¶¶ 62-85, at 16-20.  It seeks compensatory damages for wrongful death, "including aggravating damages; punitive damages, costs, pre-judgment and post-judgment interest, attorneys' fees, expenses and costs of suit, and such other relief as the Court deems just and proper."  Complaint at 21.  NC Logistics removed the case to federal court on March 19, 2015.  <u>See</u> Notice of Removal to the United States District Court for the District of New Mexico, filed March 19, 2015 (Doc. 1).

> 1.    **<u>The Motion</u>.**

Atlantic Specialty moved to intervene in the litigation on November 25, 2015.  <u>See</u> Motion at 1.  It explained that it "provided two group accidental death and dismemberment insurance policy [sic] to the Decedent and his beneficiaries pursuant to two group policies issued to Tyco International Management Company, and its affiliated company or covered subsidiary Simplex Grinnell."  Motion ¶ 6, at 2.  When Breeden died, Atlantic Specialty explains, it paid benefits under the Policies "on behalf of the Decedent."  Motion ¶ 7, at 2.  Atlantic Specialty asserts that, under "New Mexico's remedy of equitable subrogation," it "has a right of subrogation and reimbursement from any third party."  Motion ¶ 8, at 2.  It contends that the Court must allow it to intervene so that it may protect its remedy of equitable subrogation, a remedy the other patties have no interest in preserving.  <u>See</u> Motion ¶ 9, at 3 (citing Fed. R. Civ. Proc. 24(a)(2)).  Atlantic Specialty then contends that <u>both</u> New Mexico and Pennsylvania law support its right to equitable subrogation.  <u>See</u> Motion ¶ 12(a), at 3-4 (citing <u>State Farm Mut. Auto. Ins. Co. v. Found. Reserve Ins. Co.</u>, 1967-NMSC-197, ¶ 27, 431 P.2d 737, 741 and <u>Holloran v. Larrieu</u>, 431 Pa. Super. 558, 561, 637 A.2d 317, 318 (1994)).

2.      **The Responses**.

NC Logistics responded on December 8, 2015.  See Defendant North Carolina Logistics, Inc.'s Response to Atlantic Specialty Insurance Company's Motion to Intervene as Plaintiff, filed December 8, 2015 (Doc. 74)("NC Response").  The NC Response argues that Atlantic Specialty is a life insurer not entitled to subrogation.  See NC Response at 2.  First, it groups together life insurance and accidental death insurance.  See NC Response at 4-5.  Second, it allows that New Mexico has not addressed "whether a life insurer can seek equitable subrogation for funds paid to the beneficiaries of life insurance policies," but cites United States Court of Appeals for the Tenth Circuit and Pennsylvania cases, and several treatises, suggesting that it should not recognize such a right to subrogation.  See NC Response at 3 (citing Lee Way Motor Freight, Inc. v. Yellow Transit Freight Lines, Inc., 251 F.2d 97, 99 (10th Cir. 1957); 16 Couch on Insurance § 222:25 (3d ed. 2015); Panea v. Isdaner, 2001 PA Super 108, ¶ 25, 773 A.2d 782, 795 (2001); 46A C.J.S. Insurance § 2027).  It adds that Atlantic Specialty's cited cases "address the rights of indemnity insurers, not life insurers."  NC Response at 2.   Third, it notes that Atlantic Specialty cannot point to any statutory or contractual provision entitling it to subrogation.  See NC Response at 5-6.  Finally, it explains that allowing subrogation for life insurance would harm public policy, as the proceeds "of a wrongful death action are for the exclusive benefit of the surviving spouse."  Response at 6.

Cabrera-Salgado responded on December 8, 2015.  See Defendants Cabrera-Salgado's Response in Opposition to Atlantic Specialty Insurance Company's Motion to Intervene as Plaintiff, filed December 8, 2015 (Doc. 75)("Cabrera-Salgado Response").  The Cabrera-Salgado Response makes many of the same arguments that NC Logistics makes, even citing the same sources that NC Logistics cites.  See Cabrera-Salgado Response at 3 (citing 46A C.J.S. Insurance

§ 2027).  It cites to a new Pennsylvania case, <u>Panea v. Isdaner</u>, 2001 PA Super 108, 773 A.2d 782 (2001), which states that "a life insurance carrier does not obtain any right to subrogate against the recovery in the malpractice action by virtue of its paying a claim pursuant to the life insurance policy."  Cabrera-Salgado Response at 4 (citing 2001 PA Super 108, ¶ 25, 773 A.2d at 795).  It concludes that Atlantic Specialty "has failed to carry its burden, regardless of whether New Mexico or Pennsylvania law is applied."  Cabrera-Salgado Response at 5.

Hunt responded on December 9, 2015.  <u>See</u> Plaintiff's Response in Opposition to Atlantic Specialty Insurance Company's Motion to Intervene as Plaintiff, filed December 9, 2015 (Doc. 76)("Hunt Response").  The Hunt Response makes three primary arguments.  <u>See</u> Hunt Response at 1.  First, it contends that the Policies themselves, which it characterizes as "life insurance policies," do not include any provision allowing for subrogation or reimbursement. Response at 1.  Second, it argues that New Mexico law does not recognize any "'equitable' subrogation claim for a life insurance policy."  Hunt Response at 1.  It notes that, in New Mexico, equitable subrogation "is a remedy for the benefit of one ***secondarily liable***, who has ***paid the debt of another*** and to whom in equity and good conscience should be assigned the rights and remedies of the original creditor."  Hunt Response at 5 (quoting <u>Dairyland Ins. Co. v. Herman</u>, 1998-NMSC-005, ¶ 23, 954 P.2d 56, 63)(emphasis in Hunt Response).  It explains that Atlantic Specialty "did not pay damages but rather a contracted sum that was agreed to in advance."  Hunt Response at 6.  It cites cases from numerous other jurisdictions refusing to allow equitable subrogation for life insurance providers.  <u>See</u> Hunt Response at 9.  Finally, it argues that the Motion is untimely and requests sanctions.  <u>See</u> Hunt Response at 1, 10-12.

3.     **The Reply**.

Atlantic Specialty replied on December 23, 2015.  See Reply at 1.  Atlantic Specialty appears to abandon its arguments based on Pennsylvania law and does not cite Panea v. Isdaner. See Reply at 1-9.  It instead contends that the Policies "fall with [sic] the class of accident insurance which are [sic] indemnity contracts to which New Mexico's remedy of equitable subrogation applies."  Reply at 3.  It cites a series of cases to show that New Mexico recognizes the concept of equitable subrogation.  See Reply at 4.  It counters its opponents' public policy arguments by contending that it has no intention of "taking away or reducing an award to any other statutory beneficiary."  Reply at 4.  Instead, it explains, it "is merely seeking an opportunity to intervene and assert its claim against the alleged tortfeasors for any amounts to be determined at a later date."  Reply at 4 (citing Amica Mut. Ins. Co. v. Maloney, 1995-NMSC-059, ¶ 9, 903 P.2d 834, 838).

Atlantic Specialty also attempts to distinguish accidental death policies from life insurance policies.  See Reply at 5-9.  First, it notes that the Policies are distinct, because they require that an "accident" occur before any benefits are due.  Reply at 5.  It adds that Breeden had a separate life insurance policy from a different carrier.  See Reply at 6 n.4.  Second, Atlantic Specialty contends that the Policies "are considered casualty insurance or group accident and sickness insurance" under Pennsylvania law.  Reply at 7 (citing 40 Pa. Stat. Ann. § 756.2 and Erbe v. Connecticut Gen. Life Ins. Co., 695 F. Supp. 2d 232, 267 (W.D. Pa. 2010)(McVerry, J.)). Third, it argues that the Policies are indemnity contracts, because they compensate the insured for a measurable loss -- in this case, a total of roughly nine times Breeden's salary.  See Reply at 7-8.  It cites a Wisconsin case for the proposition that accidental death benefits are promises to indemnify against the insured's accidental death.  See Reply at 8 (citing Taylor v. Greatway Ins.

Co., 2000 WI App 64, ¶ 22, 608 N.W.2d 722, 729.   Fourth, it notes that New Mexico allows subrogation in wrongful death actions.  See Reply at 9.

### 4.   **The Hearing.**

The Court held a hearing on March 6, 2016.  See Transcript of Hearing (taken March 6, 2016)("Tr.").[1]  The Court and the parties began the hearing by agreeing on a clear procedural course of action.  See Tr. at 27:21-31:20 (Borner, Court, Hill, Johnson, McGinn, Sievers).  The Court would allow Atlantic Specialty to intervene and author an opinion deciding whether Atlantic Specialty has a right of equitable subrogation.  See Tr. at 28:5-11 (Court).  That opinion would then be binding on Atlantic, preventing it from raising the same arguments in other courts as to these parties.  See Tr. at 28:5-8 (Court).  Although the Court added that it was inclined to reject Atlantic Specialty's arguments for equitable subrogation, see Tr. at 28:9-12 (Court), all parties agreed to the arrangement, see Tr. at 31:13-21 (Borner, Court, Hill, Johnson, McGinn, Sievers).  The Court permitted Atlantic Specialty to supplement its briefing after the hearing. See Tr. at 31:11-13 (Court).

Hunt spoke first in opposition to the Motion.  See Tr. at 32:4-40:10 (Court, McGinn).  He argued that there was no meaningful difference between accidental death insurance and life insurance policies in this context, as both pay out a fixed amount upon the occurrence of a particular event.  See Tr. at 32:14-33:4 (McGinn).  He noted that his counsel had not found any cases allowing subrogation for life insurance or accidental death insurance.  See Tr. at 34:20-35:5 (Court, McGinn).  Hunt argued that life insurance and accidental death policies are distinct from indemnity policies, because they can specify that any beneficiary receives an amount

---

[1]The Court's citations to the transcript of this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

"unrelated to the value of his life . . . [and] the circumstances of the accident."  Tr. at 39:7-8 (McGinn).  He added that, on Atlantic Specialty's subrogation theory, a "life insurance company could now come into a wrongful death case and prevent the statutory beneficiaries under New Mexico law from getting any money because they would take the first million dollars of the policy."  Tr. at 39:17-21 (McGinn).

NC Logistics then entered the fray.  See Tr. at 40:15-49:2 (Court, Eaton).  It noted that several treatises on point address both life insurance and "accident insurance."  Tr. at 41:14-18 (Eaton).  It distinguished life and accidental death insurance from other insurance on the grounds that: (i) indemnity agreements must be premised on a wrongful third party's acts; (ii) the subrogation amount is the harmed party's actual loss; and (iii) in life insurance and accidental death cases, it is impossible to precisely evaluate the actual loss.  See Tr. at 43:16-44:21 (Eaton).  The actual loss, it added, was not the amount that Atlantic Specialty had to pay under the Policies.  See Tr. at 45:2-11 (Eaton).  It concluded that the Court should focus on the "indemnification principles" absent from the Policies.  Tr. at 48:17-19 (Eaton).

Cabrera-Salgado focused on the Policies' terms, explaining that he "didn't see any of the telltale signs that this policy was anything remotely close to an indemnity policy," such as a consent-to-settle clause or a clause protecting the insurance company's rights to recover money that it paid out.  Tr. at 49:19-50:10 (Borner, Court).  He explained that indemnity policies effectively pay "the debt of another" -- a fixed amount of damages that a tortfeasor owes to a victim.  Tr. at 51:2-11 (Borner).

Atlantic Specialty made numerous arguments in support of its position.  See Tr. at 51:22-62:17 (Court, Johnson).  It argued that the Policies were indemnity policies, because they awarded a multiple of the decedent's salary.  See Tr. at 53:23-54:1 (Court, Johnson).  Allowing

accidental death insurers equitable subrogation rights, it noted, would deter tortious conduct.  See

Tr. at 55:3-8 (Court, Johnson).  It explained that it was "stepping into the shoes of the insured,

Mr. Breeden, for purposes of collecting [] the future wage loss that he has suffered by being

killed in this accident."  Tr. at 56:6-9 (Johnson).  In response to the Court's point that life

insurance for federal employees could be structured in multiples of their salaries, Atlantic

Specialty added that the multiple of salary, the special extra requirement of an accident, and the

interplay with New Mexico's wrongful death statute made its Policies indemnity policies.  See

Tr. at 57:25-61:7 (Court, Johnson).  It stated that the closest case on point was likely Taylor v.

Greatway Insurance Company.  See Tr. at 62:1-13 (Johnson).  Finally, it asserted that an award

of costs against it would be inappropriate, because the Court had allowed it into the case.  See Tr.

at 56:21-24 (Johnson).

　　　　NC Logistics followed up with two rebuttals.  See Tr. at 64:6-65:7 (Eaton).  First, it

explained that the

> payment of the 1 million, $65,000 would have been paid regardless of who
> caused the accident or if anybody caused the accident.  Mr. Breeden could have
> died falling off a ladder and that amount would have been paid out.  The fact that
> there was a fixed amount that was contracted for by Mr. Breeden's employer
> shows that this is truly a contract of investment and not indemnification.

Tr. at 64:16-24 (Eaton).  Second, it stated that the Wrongful Death Act, N.M. Stat. Ann. §§ 41-2-

1 to 41-2-4, which best expresses New Mexico's public policy, prohibits the treatment of

wrongful death awards as the injured party's debts.  See Tr. at 65:3-10 (Eaton).  Hunt added that

> had we known in advance and if there were a right to equitable subrogation for a
> million dollars and there was only a million dollars of insurance, we would advise
> the family probably not bring a wrongful death action because if all of the money
> is going back to Atlantic Specialty there would be no lawsuit[.]

Tr. at 70:10-16 (McGinn).

　　　　The Court then summarized its inclination:

> Well, I still am inclined to think that New Mexico would not recognize this law.  I know there is a little bit of a choice of law issue here, but I'm not sure it makes a lot of difference but I may have to work it through to make that determination, but assuming it is New Mexico law, I don't think New Mexico would extend its equitable subrogation to an accidental [death] insurance policy.  I'm not sure that I agree.  I mean, I see the difference between an accidental insurance policy and a life insurance policy, but I'm not sure that the principles that have grown up around equitable subrogation for life insurance policies shouldn't be extended to this accident policy as well.  I'm not sure that I see this as being an indemnity policy.  I still think it has the features of a life insurance policy, and [] the general principles that apply to those inequitable subrogation should apply to these.  So I'll try to get an opinion out to you which will then be a motion to dismiss.  So I'll grant the motion to intervene and grant the motion to dismiss.

Tr. at 71:2-22 (Court).

### 5.    __The Letter.__

On March 30, 2016, Atlantic Specialty sent a letter to the Court as a "follow-up on clarification" on its earlier arguments.  Letter from Alyssa A. Johnson, Matthiesen, Wickert & Lehrer, S.C., to the Court (dated March 30, 2016), filed March 30, 2016 (Doc. 141)("Letter").  The Letter begins by noting that the Policies[2] are accident policies under Pennsylvania law and their terms.  See Letter at 1.  It details the differences between life insurance policies and accident policies.   See Letter at 1.   It concludes that, in Pennsylvania, the Policies "are considered casualty insurance or group accident and sickness insurance, and not life insurance."  Letter at 1 (citing 40 Pa. Stat. Ann. § 756.2 and Erbe v. Connecticut Gen. Life Ins. Co., 695 F. Supp. 2d at 268).

The Letter acknowledges that, "[w]hen subrogation is not expressly permitted in a

---

[2]Atlantic Specialty refers to one "specific policy" in its opening sentence, but refers to "Policies" in the rest of its letter.  Letter at 1.  The Court assumes that Atlantic Specialty intends to refer to multiple policies.  See Motion ¶ 7, at 2 ("As a result of Defendants' negligence, Atlantic Specialty Insurance Company, pursuant to its obligations under two group accidental death and dismemberment insurance policies, paid benefits on behalf of the Decedent.")(emphasis added).

contract, the right to equitable subrogation is based upon whether the insurance contract is one of 'indemnity' or 'investment' and is not allowed in investment contracts." Letter at 1 (citing Lambert v. Wrensch, 135 Wis. 2d 105, 117, 399 N.W.2d 369, 374 (1987)).  It adds that a life insurance policy is an investment, because it "does not take into account the value of life." Letter at 2.

The Letter then differentiates the Policies from investment contracts.  See Letter at 2.  It explains that the Policies are indemnity contracts -- "the value of Mr. Breeden's life entered into the transaction of contracting for the Policies because the benefit paid was for the loss of his yearly salary."  Letter at 2.  It quotes a Wisconsin case for the proposition that "[t]o indemnify" is "[t]o reimburse (another) for a loss suffered."  Letter at 2 (quoting Taylor v. Greatway Ins. Co., 2000 WI App 64, ¶ 21, 608 N.W.2d 722, 729).  The Policies, it notes, were "meant to indemnify for the loss of Mr. Breeden's salary."  Letter at 2.

The Letter concludes with a policy argument.  See Letter at 2.  It explains that its equitable subrogation claim promotes the intent behind New Mexico's Wrongful Death Act by "making it costly for the wrongdoers and holding them accountable for their actions, regardless of their insurance policy limits."  Letter at 2.  It responds to Hunt's argument that such a rule would discourage plaintiffs' suits by asserting that: (i) interfering with plaintiffs "is not the intent of Atlantic" Specialty; and (ii) a third party's insurance limits are irrelevant to its claim for equitable subrogation.  Letter at 2.

### 6.     **The Letter Response**.

Hunt responded to the letter on April 11, 2016.  See Response to Atlantic Specialty Insurance Company's Letter to the Court regarding its Asserted Right to Subrogation, filed April 11, 2016 (Doc. 150)("Letter Response").  The Letter Response repeats Hunt's arguments

that New Mexico law, rather than Pennsylvania law, governs this dispute.  See Letter Response at 3-4 (citing State Farm Ins. Co. v. Bell, 39 F. Supp. 3d 1352, 1356 (D.N.M. 2014)(Johnson, J.)).  It then attacks Atlantic Specialty's argument that the Policies are indemnity agreements.  See Letter Response at 4-5.  It cites a New Mexico statute stating that "[t]he transaction of life insurance includes . . . additional incidental benefits in event of death or dismemberment by **accident or accidental means**[.]"  Letter Response at 5 (quoting N.M. Stat. Ann. § 59A-7-2)(emphasis in Letter Response).

The Letter Response then attempts to distinguish Atlantic Specialty's cited cases, calling them either wholly irrelevant or easily distinguishable.  See Letter Response at 5-7.  The Letter Response distinguishes between benefits "due upon the occurrence of specified events," which are "independent of the right against any third-party responsible for the injury," and the right of a surety, which is "primarily liable for paying another's debt or performing another's obligation." Letter at 6-7.  It concludes that Atlantic Specialty's public policy argument "misses the point that Atlantic has no ability to step into the shoes of the personal representative and would be unable to bring a lawsuit for wrongful death on its own."  Letter Response at 10.  It again requests that the Court impose sanctions on Atlantic Specialty.  See Letter Response at 10-11.

## LAW REGARDING NEW MEXICO CHOICE-OF-LAW RULES

Where a plaintiff invokes a federal district court's diversity jurisdiction, the district court looks to the forum state's choice-of-law rules to determine which state's substantive law to apply.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).  The first step in a New Mexico choice-of-law analysis is to characterize the claim by "area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or

issue." Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142 P.3d 374, 377.  There

are only a few categories within which claims might fall -- "[t]ort cases, i.e., all 'civil wrongs,'

are one class; contracts, i.e., every kind of enforceable promise, is another single class."   J.

McLaughlin, Conflict of Laws: the Choice of Law Lex Loci Doctrine, the Beguiling Appeal of a

Dead Tradition, Part One, 93 W. Va. L. Rev. 957, 989 (1991)(describing the categories as "tort,

contract, or some other").   The court is then to apply the New Mexico choice-of-law rule

applicable to that category of claim to determine what state's substantive law to apply.   See

Guidance Endodontics, LLC v. Dentsply Intern., Inc., 749 F. Supp. 2d 1235, 1257 (D.N.M.

2010)(Browning, J.).

When a claim sounds in contract, New Mexico will generally apply the choice-of-law

rule of lex loci contractus -- the law of the place of contracting.  See Ferrell v. Allstate Ins. Co.,

2008-NMSC-042, ¶ 52, 188 P.3d 1156, 1172.  Like most states, however, "New Mexico respects

party autonomy; [therefore] the law to be applied to a particular dispute may be chosen by the

parties through a contractual choice-of-law provision."   Fiser v. Dell Computer Corp., 2008-

NMSC-046, ¶ 7, 188 P.3d 1215, 1218 (citing N.M. Stat. Ann § 55-1-301(A)).   See United

Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 1989-NMSC-030, ¶ 11, 775 P.2d 233,

236.   "[W]hen application of the law chosen by the parties offends New Mexico public policy,"

however, a New Mexico court "may decline to enforce the choice-of-law provision and apply

New Mexico law instead."   Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d 1215,

1218.  "New Mexico courts will not give effect to another state's laws where those laws would

violate some fundamental principle of justice."   Fiser v. Dell Computer Corp., 2008-NMSC-046,

¶ 7, 188 P.3d at 1218 (internal quotations omitted).  Where the plaintiff has invoked the federal

district court's diversity jurisdiction, the court will accept New Mexico's law regarding whether

to honor a contractual choice-of-law provision.  See MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc., 436 F.3d 1257, 1260 (10th Cir. 2006)("In cases like this one, where subject matter jurisdiction is based on diversity of citizenship, federal courts must look to the forum state's choice-of-law rules to determine the effect of a contractual choice-of-law clause.").

On the other hand, if the underlying claim is categorized as a tort, "New Mexico courts follow the doctrine of *lex loci delicti commissi* -- that is, the substantive rights of the parties are governed by the law of the place where the wrong occurred."  Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 12, 142 P.3d 374, 377.  See Restatement (First) of Conflicts of Law § 377 & cmt. a (1934).  Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred.  See First Nat. Bank in Albuquerque v. Benson, 1976-NMCA-072, ¶ 9, 553 P.2d 1288, 1289 (referring to the rule as requiring application of "the law of the State of injury"); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 663 F. Supp. 2d at 1150-51.

Claims for unjust enrichment are distinct from claims sounding in contract or tort law. See Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 19, 793 P.2d at 860 ("We have no disagreement with the scholarly view that restitution for unjust enrichment constitutes an independent basis for recovery in a civil-law action, analytically and historically distinct from the other two principal grounds for such liability, contract and tort.").  The Restatement (First) of Conflict of Laws § 453 provides: "When a person is alleged to have been unjustly enriched, the law of the place of enrichment determines whether he is under a duty to repay the amount by which he has been enriched."  Restatement (First) of Conflict of Laws § 453.  Although "New Mexico has traditionally followed the Restatement (First)," Ferrell v. Allstate Insurance Co., 2008-NMSC-042, ¶ 50, 188 P.3d at 1171, the Supreme Court of New Mexico has been willing to

follow the Restatement (Second) of Conflict of Laws in certain cases, such as in multi-state class action cases in which the laws of the states involved actually conflict, because the Restatement (First) of Conflict of Laws is "particularly ill-suited for the complexities present in multi-state class actions," id. at 2008-NMSC-042, ¶ 56, 188 P.3d at 1173 (adopting the Restatement (Second) of Conflict of Laws for multi-state contract class actions).  In Fowler Brothers, Inc. v. Bounds, the Court of Appeals of New Mexico explained that courts can "avoid a choice of law question when the laws of the involved states would produce identical results," and agreed with the district court's implicit determination that Arizona and New Mexico law on unjust enrichment did not conflict as applied in the case.  Fowler Bros., Inc. v. Bounds, 2008-NMCA-091, ¶¶ 9, 20, 188 P.3d at 1265-66.

## NEW MEXICO LAW REGARDING FALSE CONFLICTS OF LAW

In Ferrell v. Allstate Insurance Co., the Supreme Court of New Mexico describes the "false conflict" or "actual conflict"[3] doctrine: "Under this analysis, when the laws of the relevant states do not actually conflict, the court may avoid a conflict-of-law analysis and may apply forum law to the entire class."  Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 16, 188 P.3d at 1164 (citing Phillips Petroleum Co. v. Shutts, 472 U.S. at 816).  "If, however, the laws of the

---

[3] The Supreme Court of New Mexico uses the term "actual conflict" to refer to what the Court of Appeals of New Mexico has called the "false conflict" doctrine, because

> "false conflict" actually has two different meanings. See Robert A. Leflar et al., American Conflicts Law, § 92, at 270 (4th ed. 1986).  The first meaning of "false conflict" arises from the choice-of-law method advanced by Professor Brainerd Currie, "the governmental interest" analysis.  Id. at 270-71.  Under Currie's method, a false conflict arises when "only one of the involved states would be interested in applying its law."  Eugene F. Scoles et al., Conflict of Laws § 2.9, at 28 (4th ed. 2004).  The second meaning of the term "false conflict" is "no conflict of laws."  Leflar et al., supra, § 92, at 272.

Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 16 n.2.

relevant states actually conflict, or if the laws of certain of the relevant states conflict, then the forum court must resolve that conflict using the choice-of-law rules contained in the forum state's conflict-of-laws doctrine."  2008-NMSC-042, ¶ 16, 188 P.3d at 1164.  The doctrine's focus is "not on whether the laws are superficially identical as written, but whether the effect of laws would be identical as applied to a particular case."  Fowler Bros., Inc. v. Bounds, 2008-NMCA-091, ¶ 9, 188 P.3d at 1265.

In Fowler Brothers, Inc. v. Bounds, an unlicensed contractor that was a purported employee of a licensed contractor working on an out-of-state contractor brought action against the licensed contractor for breach of contract and unjust enrichment after the licensed contract ceased to pay for work on the project.  See 2008-NMCA-091, ¶¶ 2-4, 188 P.3d at 1263-64.  The Court of Appeals of New Mexico, in an opinion that the Honorable Michael Bustamante wrote and in which the Honorable Lynn Pickard and Roderick T. Kennedy joined, held that Arizona and New Mexico contractor licensing law did not conflict as applied to the action.  See 2008-NMCA-091, ¶ 15, 188 P.3d at 1266.  The district court had concluded that: (i) under either Arizona or New Mexico law, the plaintiff was required to have an Arizona contractor's license to perform work on the project; and (ii) under either Arizona or New Mexico law, the plaintiff is prohibited from recovering under any cause of action, including equitable remedies, for its work on the project, because it did not have such a license.  See 2008-NMCA-091, ¶ 5, 188 P.3d at 1264.  The district court had avoided the choice-of-law issue by determining, albeit implicitly, that the applicable law of Arizona and New Mexico were the same or would yield the same results.  See 2008-NMCA-091, ¶ 8, 188 P.3d at 1265.  More specifically, the district court had dismissed the plaintiff's claims on the basis of its legal conclusion that, "[u]nder either Arizona or New Mexico law, Plaintiff is prohibited from recovering under any cause of action, including

equitable remedies, for its work on the Project, because it did not have [an Arizona's contractor's] license."  2008-NMCA-091, ¶ 5, 188 P.3d at 1264.

The Court of Appeals of New Mexico found that implicit in the district court's conclusion was its determination that there was no conflict between Arizona and New Mexico law as it relates to the dispositive issue in this case, i.e., whether the plaintiff was required to have an Arizona contractor's license to recover damages for its work on the project.  See 2008-NMCA-091, ¶ 8, 188 P.3d at 1266.  Judge Bustamante said the Court of Appeals of New Mexico would first consider whether the district court correctly determined that no conflict existed between Arizona and New Mexico law with respect to the case's circumstances, and concluded that no conflict existed.   See 2008-NMCA-091, ¶¶ 8-11, 188 P.3d at 1266-67 ("This Case Presents No Conflict Between Arizona and New Mexico Law." (bold removed)).

The Court applied New Mexico's approach to false conflicts of law in Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d 1244 (D.N.M. 2014)(Browning, J.).  There, the Court had to determine whether there was a conflict between Colorado and New Mexico law on unjust enrichment.  See 20 F. Supp. 3d at 1269.  The Court explained that it was "reluctant" to conclude that no conflict existed:

> Under Colorado law, the defendant does not need to "appreciate and accept the benefit conferred," Salzman v. Bachrach, 996 P.2d at 1266 n. 2, while New Mexico law requires a plaintiff prove that the defendant "has been knowingly benefitted" at the plaintiff's expense, see Ontiveros Insulation Co. v. Sanchez, 2000–NMCA–051, ¶ 11. Further, as the Court will explain in its analysis of New Mexico unjust enrichment law, New Mexico law is not settled -- by an opinion from the Supreme Court of New Mexico -- whether a plaintiff is barred from pursuing an unjust enrichment claim when there is a contract governing the same subject matter with a different party. Colorado law, on the other hand, speaks more clearly to this issue, and bars unjust enrichment claims unless the unjust enrichment claim covers conduct outside the express contract or if the party does not have a right under an enforceable contract.

20 F. Supp. 3d at 1269.  The Court nonetheless held that it "must apply New Mexico's choice-of-law analysis, including its actual conflict doctrine."  20 F. Supp. 3d at 1269-70.  It concluded that there was no conflict under New Mexico law, because "the result is the same under either state's substantive law."  20 F. Supp. 3d at 1269-70.

> In this case, the Court has analyzed the unjust enrichment claims under Colorado and New Mexico law, as it explains in the following analysis sections, and reaches the same conclusion -- that it should dismiss the unjust enrichment claims against WFC/WER. Thus, under New Mexico choice-of-law analysis, there is no conflict between Colorado and New Mexico unjust enrichment law as applied in this case.

20 F. Supp. 3d at 1269-70.

## NEW MEXICO LAW REGARDING UNJUST ENRICHMENT

"New Mexico has long recognized actions for unjust enrichment . . . ."  Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d 695, 698 (citing Tom Growney Equip., Inc. v. Ansley, 1994-NMCA-159, ¶ 6, 888 P.2d 992, 994).  To prevail on an unjust enrichment claim, "one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust."  Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698.  "The theory has evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in contract and instead must seek refuge in equity."  Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698.  See Credit Inst. v. Veterinary Nutrition Corp., 2003-NMCA-010, ¶ 21, 62 P.3d 339, 344; Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 9, 793 P.2d 855, 857.  The Supreme Court of New Mexico has stated that "[t]he general equity jurisdiction of the trial court is not available, although properly pleaded, because appellee in fact had an adequate remedy at law."  Gen. Tel. Co. of the Sw. v. State Tax Comm'n, 1962-NMSC-005, ¶ 18, 367 P.2d 711, 715.  See Sims v. Sims, 1996-NMSC-078, ¶ 28, 930 P.2d 153, 159 (stating

that "equity will not act if there is a complete and adequate remedy at law").  Cf. Lopez v. Kase,

1999-NMSC-011, ¶ 6, 975 P.2d 346, 348 (stating that the Supreme Court of New Mexico

"generally will not grant equitable relief by way of an extraordinary writ when there is an

adequate remedy available to the petitioner at law, absent unusual and compelling

circumstances").

**NEW MEXICO LAW REGARDING THE INTERRELATION OF TORT,
QUASI-CONTRACT, AND CONTRACT CLAIMS**

In Elliott Industries Limited Partnership v. BP America Production Company, 407 F.3d

1091 (10th Cir. 2005)("Elliott Indus."), the Tenth Circuit held that, under New Mexico law, "the

existence of any tort liability cannot conflict with contractual duties between the parties."  407

F.3d at 1116 (citing Isler v. Tex. Oil & Gas Corp., 749 F.2d 22 (10th Cir. 1984) and Rio Grande

Jewelers Supply, Inc. v. Data Gen. Corp., 1984-NMSC-094, ¶ 7, 689 P.2d 1269, 1271).  See

Hess Oil Virgin Islands v. UOP, Inc., 861 F.2d 1197, 1200 (10th Cir. 1988)(applying Illinois and

Virgin Islands law)(explaining that Isler v. Texas Oil and Gas Corp. holds that "no tort duty can

be imposed on a party where that party's same duties and rights are specifically defined by

contract").  In Isler v. Texas Oil and Gas Corp., the Tenth Circuit reversed a judgment in favor of

the plaintiffs where a defendant failed to make rental payments despite a provision in the

plaintiffs' leases that the defendant had no responsibility to the plaintiffs if it failed to make

rental payments.  See 749 F.2d at 22.  A jury returned a verdict that the defendant did not breach

its duties under the leases, but that it was "nonetheless liable in tort for damages caused by its

negligence."  749 F.2d at 22.  The Tenth Circuit noted that the facts alleged in the plaintiffs' tort

claim were "precisely the same" as those in the plaintiffs' breach-of-contract claim.  749 F.2d at

24.  The Tenth Circuit held that, because the parties had chosen to define their rights and duties

regarding rental payments in contract, the parties' leases preclude "any extracontractual duty

regarding such payments."  749 F.2d at 24.  The Tenth Circuit has explained that this contractual preclusion of tort claims occurs "because parties should 'be bound by the terms of written agreements to which they freely commit themselves.'"  Elliott Indus., 407 F.3d at 1116 (quoting Rio Grande Jewelers Supply, Inc. v. Data Gen. Corp., 1984-NMSC-094, ¶ 7, 689 P.2d at 1271).

Additionally, the Tenth Circuit has explained that the "hornbook rule [is] that quasi-contractual remedies . . . are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue."  Elliott Indus., 407 F.3d at 1117.  In Elliott Indus., for example, the Tenth Circuit held that the plaintiffs' leases with ConocoPhillips that defined ConocoPhillips' royalty obligations preluded the plaintiffs' claims that ConocoPhillips' royalty payment practices unjustly enriched it at the plaintiffs' expense.  See 407 F.3d at 1117.  The plaintiffs contended that the leases did not preclude their claim for unjust enrichment, because they did not contain an express contractual provision covering ConocoPhillips' deduction of a thirty-nine percent processing fee from the plaintiffs' royalty payments.  See 407 F.3d at 1117.  The Tenth Circuit reasoned, however, that although "the contracts may not delineate any specific deductions," the leases "control how royalties are to be paid."  407 F.3d at 1117.  The Tenth Circuit held, therefore, that the district court properly granted ConocoPhillips summary judgment on the plaintiffs' unjust enrichment claim, because "the claim for underpayment of royalties is grounded in the parties' contractual relationships."  407 F.3d at 1117.

## RELEVANT LAW REGARDING SUBROGATION

New Mexico recognizes that the doctrine of subrogation "allows an insurer who has fully compensated the insured to step into the shoes of the insured and collect what it has paid from the wrongdoer."  Amica Mutual Insurance Co. v. Maloney, 1995-NMSC-059, ¶ 9, 903 P.2d at

838.   "Subrogation, whether created by contract or by operation of law, is an equitable remedy and equitable principles control its application."   Farmers Ins. Group of Companies v. Martinez, 107 N.M. 82, 83, 752 P.2d 797, 799 (Ct. App. 1988).   Subrogation is therefore "an equitable remedy of civil law origin whereby through a supposed succession to the legal rights of another, a loss is put ultimately on that one who in equity and good conscience should pay it."   U. S. Fid. & Guar. Co. v. Raton Nat. Gas Co., 1974-NMSC-030, ¶ 9, 521 P.2d 122, 124.

In State Farm Mutual Automobile Insurance Co. v. Foundation Reserve Insurance Co., a driver's automotive insurance carrier paid him for damages he sustained in a collision.   See 1967-NMSC-197, ¶ 27, 431 P.2d at 741.   The driver's carrier then sued the other driver's insurance carrier, arguing that it had a right of subrogation.   See 1967-NMSC-197, ¶ 23, 431 P.2d at 741.   The Supreme Court of New Mexico noted:

> A distinction is sometimes made between legal and conventional subrogation. Legal subrogation arises by operation of law; conventional subrogation arises by convention or contract of the parties.   Whether legal or conventional, subrogation is an equitable remedy.   The remedy is for the benefit of one secondarily liable who has paid the debt of another and to whom in equity and good conscience should be assigned the rights and remedies of the original creditor.

1967-NMSC-197, ¶ 24, 431 P.2d at 741 (citations omitted)(emphasis added).   It also described "legal subrogation" as "equitable subrogation."   1967-NMSC-197, ¶ 38, 431 P.2d at 742.   It agreed with the first driver's carrier, holding that the first carrier "had a right of subrogation against defendant by operation of law."   1967-NMSC-197, ¶ 27, 431 P.2d at 741.

## ANALYSIS

The Court will grant the Motion in part and deny it in part.   The Court allows Atlantic Specialty into the case to assert its equitable subrogation argument.   The Court concludes that New Mexico law governs this dispute.   Because the Policies are investment contracts that do not allow for subrogation, however, it will dismiss Atlantic Specialty from this case.

## I.     __NEW MEXICO LAW GOVERNS THIS DISPUTE__.

New Mexico law applies to this dispute.[4]  NC Logistics removed this case to federal court

on diversity jurisdiction grounds on March 19, 2015.  See Notice of Removal at 1.  Given that

the Court has diversity jurisdiction, it looks to New Mexico's choice-of-law rules to determine

which state's substantive law to apply.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. at

496-97; Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d at 1255.

New Mexico's choice-of-law rules, in turn, instruct the Court to characterize the claim by

its "area of substantive law."  Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142

P.3d at 377.  No New Mexico case neatly assigns equitable subrogation into the tort or contract

category; the foundational New Mexico case states that it "arises by operation of law," is an

"equitable remedy," and is based on "equity and good conscience."  State Farm Mut. Auto. Ins.

Co. v. Found. Reserve Ins. Co., 1967-NMSC-197, ¶ 24, 431 P.2d at 741.  The Court concludes

that this language is consistent with an unjust enrichment theory.[5]  See Ridge Tool Co. v. Silva,

---

[4]Atlantic Specialty has taken inconsistent positions regarding which state's law should apply.  In the Motion, it first notes that the Policies "were issued and delivered in Pennsylvania with a choice of law provision electing Pennsylvania law."  Motion ¶ 6, at 2.  It later explains, however, that Atlantic Specialty is subrogated "pursuant to New Mexico's remedy of equitable subrogation."  Motion ¶ 8, at 2.  On the next page, it asserts that it "is entitled to reimbursement based upon the remedy of equitable subrogation pursuant to either New Mexico or Pennsylvania law."  Motion ¶ 12(a), at 3-4.  In its Letter, it appears to assume that Pennsylvania law applies.  See Letter at 1.

[5]The parties appear to assume that subrogation is more similar to a contract theory.  Atlantic Specialty contends that the Policies' terms included a "Pennsylvania choice of law provision," and that they were "issued and delivered" in Pennsylvania.  Motion ¶ 3, at 2.  Hunt, noting that the Policies state that they are "governed by the laws of the state in which [they are] delivered," contends that they were delivered in New Mexico, "where Mr. Breeden lived."  Hunt Response at 6-7.  Given that the policyholder was the Tyco International Management Company, located in Pennsylvania, the Policies were delivered in Pennsylvania.  See Policy at 2; Simms v. Metro. Life Ins. Co., 9 Kan. App. 2d 640, 646, 685 P.2d 321, 327 (1984)(drawing a distinction between the delivery locations for group policies and individual policies).  If the parties' dispute were based on the Policies alone, the Court would apply Pennsylvania law.

33 Ohio App. 3d 260, 261, 515 N.E.2d 945, 946 (1986)("Equitable subrogation is essentially a theory of unjust enrichment. Where the amount received by the insured from the tortfeasor clearly exceeds the amount of his loss, he is being unjustly enriched by the excess."); 16 Couch on Insurance § 222:24 ("The principle of subrogation will be applied or not, according to the dictates of equity and good conscience, and to considerations of public policy, resting, as it does, upon the maxim that no one should be enriched by another's loss."); Glenn R. McGillivray, What's Your Priority?: Revitalizing Pennsylvania's Approach to Equitable Subrogation of Mortgages After First Commonwealth Bank v. Heller, 58 Vill. L. Rev. 301, 309 (2013)("Most courts recognize that the doctrine is based in equity and apply it in a manner that prevents unjust enrichment and an unearned windfall.").

Unjust enrichment is a separate "area of substantive law" from contract or tort law. Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142 P.3d at 377.  See Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 19, 793 P.2d at 860 ("We have no disagreement with the scholarly view that restitution for unjust enrichment constitutes an independent basis for recovery in a civil-law action, analytically and historically distinct from the other two principal grounds for such liability, contract and tort.").  "When a person is alleged to have been unjustly enriched, the law of the place of enrichment determines whether he is under a duty to repay the amount by which he has been enriched."  Restatement (First) of Conflict of Laws § 453.  See Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d 1157, 1194 (D.N.M. 2015)(Browning, J.)("Claims for unjust enrichment are distinct from claims sounding in contract or tort law.").  The place of the alleged enrichment is New Mexico, because: (i) Breeden was a "resident and domiciliary of Rio Rancho, Sandoval County, New Mexico when he died on March 6, 2014"  Complaint ¶ 1, at 1; and (ii) Hunt, the plaintiff, "resides in Santa Fe, Santa Fe

County, New Mexico," Complaint ¶ 2, at 2.  The law of the place of enrichment, in this case, is thus New Mexico law.[6]

## II.   NEW MEXICO WOULD NOT PERMIT EQUITABLE SUBROGATION FOR THE POLICIES.

The Court concludes that the Supreme Court of New Mexico would not allow equitable subrogation for the Policies here for two primary reasons.  First, the Policies are not indemnity agreements.   Second, the recognition that Atlantic Specialty requests would subvert New Mexico's public policy by deterring plaintiffs from bringing lawsuits.

### A.   THE POLICIES ARE INVESTMENT CONTRACTS RATHER THAN INDEMNITY CONTRACTS, AND THUS NEW MEXICO LAW WILL NOT ALLOW SUBROGATION.

The Court concludes that the Policies are investment contracts rather than indemnity agreements, and thus will not allow equitable subrogation.  Subrogation "allows an insurer who has fully compensated the insured to step into the shoes of the insured and collect what it has paid from the wrongdoer." Amica Mutual Insurance Co. v. Maloney, 1995-NMSC-059, ¶ 9, 903 P.2d at 838.  It rests on the concept that "one secondarily liable who has paid the debt of another . . . in equity and good conscience should be assigned the rights and remedies of the original creditor." Fid. & Deposit Co. of Maryland v. Atherton, 1943-NMSC-046, ¶ 5, 144 P.2d at 160. If a plaintiff receives a recovery from both her insurer and a tortfeasor, for example, her insurer may bring an equitable subrogation claim against the plaintiff and the tortfeasor to prevent the

---

[6]The Court would reach the same result if it analyzed equitable subrogation as a tort.  In tort cases, "New Mexico courts follow the doctrine of *lex loci delicti commissi* -- that is, the substantive rights of the parties are governed by the law of the place where the wrong occurred." Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 12, 142 P.3d at 377.   See Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d at 1193 ("Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred.").  All alleged wrongs in this case -- the unjust enrichment and the underlying collision -- occurred or will occur in New Mexico.  See Complaint ¶ 37, at 14.

plaintiff from receiving a double recovery.  See U.S. Fid. & Guar. Co. v. Raton Nat. Gas Co., 1974-NMSC-030, ¶ 12, 521 P.2d at 125.  Atlantic Specialty seeks to recover its payments to Hunt from "the alleged tortfeasors" at "a later date."  Reply at 4.  The Defendants and Hunt reject this argument, arguing that Atlantic Specialty has not paid the debt of another and is not entitled to any subrogation.  See Hunt Response at 5; Cabrera-Salgado Response at 4; NC Response at 2.

The parties agree that the key issue is "whether the insurance contract is one of 'indemnity' or 'investment[.]'"[7] Letter at 1; Letter Response at 7 (both quoting Lambert v. Wrensch, 135 Wis. 2d at 117, 399 N.W.2d at 374).  In an investment contract, the policy owner contracts for a particular benefit due upon the occurrence of specified events.  "Under such a policy the amount payable has no necessary relation to damages actually suffered by the beneficiary.  The insured buys and pays for the right to have from another a specified sum upon the happening of a specified event."  Gatzweiler v. Milwaukee Elec. Ry. & Light Co., 136 Wis. 34, 116 N.W. 633, 634 (1908).  Investment contracts are not designed to compensate a victim for a tortfeasor's actions, but rather to pay an agreed-upon amount.  At least two treatises have concluded that investment contracts include both life insurance and accidental death insurance.

---

[7]The parties also dispute whether the Policies qualify as life insurance or accidental death insurance.  See Letter at 1; Letter Response at 5.  The Court acknowledges the differences between the two insurances in other contexts.  An accidental death policy, unlike a life insurance policy, requires some sort of external accident.  See, e.g., Erbe v. Connecticut Gen. Life Ins. Co., 695 F. Supp. 2d at 267 (requiring, under an accidental death policy, that an injury be caused "*exclusively* by a sudden, violent, unexpected, external accident")(emphasis in original).  A heart attack or pulmonary embolism, for example, generally does not qualify as the required injury.  See Bliss v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 132 F. Supp. 3d 676, 683 (D. Md. 2015)(Hazel, J.).  Acceptable accidents could include "a sudden blow, or an airplane crash, or a falling brick on one's head, or a fall in the bathtub, or a slip on an indiscernible slick of ice, or a tumble from a haystack, or a misguided dart in the eye, or a hand in the wringer."  Elton v. Bankers Life & Cas. Co., 30 Utah 2d 213, 227, 516 P.2d 165, 174 (1973).  This distinction, however, is not controlling here, as both types of insurance contracts fall within the definition of an investment contract.

See 16 Couch on Insurance § 222:27 ("No right of subrogation arises by operation of law under life and accident insurance because the indemnity feature is not present."); 46A C.J.S. Insurance § 2027 ("It is well settled that the doctrine of subrogation has no application to accident or life insurance, for the reason that accident and life insurance are not contracts of indemnity, but are investment contracts.").   "[A]n investment contract pays a fixed sum to the insured upon the happening of a specified event. There is an absolute right of payment under an investment contract that is not dependent upon a finding of third-party liability of the triggering event." David v. Hamburg Mut. Ins. Co., 181 Wis. 2d 365, 514 N.W.2d 421 (Ct. App. 1993)(table decision).   A life insurance or accidental death insurance policy does not compensate the policyholder for his or her death -- it instead provides a lump sum payment.  That a life insurance or accidental death policy provides benefits equivalent to a multiple of the policyholder's salary does not alter this classification.  As the Court noted at the hearing, certain federal benefits allow employees to select life insurance amounts equal to roughly eight times their salaries at their time of death.  See Tr. at 57:25-61:7 (Court, Johnson).

Indemnity contracts, on the other hand, compensate the insured for a measurable loss.  To "indemnify" is to "reimburse (another) for a loss suffered because of a third party's or one's own act or default."   Indemnify, Black's Law Dictionary (10th ed. 2014).   Indemnity contracts include automotive insurance, fire insurance, and property insurance.  See David v. Hamburg Mut. Ins. Co., 181 Wis. 2d 365, 514 N.W.2d 421 ("An indemnity contract generally reimburses the insured for actual expenses that have been incurred or paid."); Cunningham v. Metro. Life Ins. Co., 121 Wis. 2d 437, 447, 360 N.W.2d 33, 38 (1985); 16 Couch on Insurance § 222:27.

Equitable subrogation is possible only where a contract is an indemnity contract.  See 16 Couch on Insurance § 222:27 ("No right of subrogation arises by operation of law under life and

accident insurance because the indemnity feature is not present."); 46A C.J.S. Insurance § 2027 ("It is well settled that the doctrine of subrogation has no application to accident or life insurance, for the reason that accident and life insurance are not contracts of indemnity, but are investment contracts."); Cont'l CA's. Co. v. Curl, 721 So. 2d 431, 433 (Fla. Dist. Ct. App. 1998)(rejecting equitable subrogation for "valued" policies in which the amount to be paid "is settled by agreement between the parties and inserted into the policy"); Ksionek v. DHFS, 2000 WI App 186, ¶ 14, 617 N.W.2d 907 ("The distinction between indemnity and investment determines the availability of equitable subrogation."). "[I]f a contract is one of investment, an insurer will not be permitted to receive subrogation, absent an express subrogation clause or agreement." 16 Couch on Insurance § 222:25. But see Sec. Ins. Co. of New Haven-The Connecticut Indem. Co. v. Mangan, 250 Md. 241, 249, 242 A.2d 482, 487 (1968)(criticizing the distinction between investment and indemnity contracts).[8]

The Court concludes that the Supreme Court of New Mexico would follow this general rule -- that indemnity contracts, but not investment contracts, can support equitable subrogation. Although New Mexico has not yet addressed life or accidental death insurance and equitable subrogation, its existing opinions reflect a theory that subrogation allows an insurer, which has compensated an insured for a specific loss, to recover the amount of that loss from a tortfeasor. See Amica Mut. Ins. Co. v. Maloney, 1995-NMSC-059, ¶ 9, 903 P.2d at 838 ("Ordinarily the right of subrogation allows an insurer who has fully compensated the insured to step into the shoes of the insured and collect what it has paid from the wrongdoer.")(emphasis added); Health

---

[8]The Court notes that Atlantic Specialty would not be able to intervene even under the law as stated in Security Insurance Company of New Haven-The Connecticut Indemnity Co. v. Mangan. Although the court there rejected the distinction between indemnity and "liability," it nonetheless held that "an insurer who writes life, health and accident, or workmen's compensation coverage is denied subrogation unless specifically permitted by a policy provision or sanctioned by statute." 250 Md. at 249, 242 A.2d at 487.

Plus of New Mexico, Inc. v. Harrell, 1998-NMCA-064, ¶ 12, 958 P.2d 1239, 1242 ("The right of subrogation allows the insurance company, which has compensated the insured, to step into the shoes of the insured and collect what it has paid to the insured from the third party tortfeasor.")(quotations omitted)(emphasis added).

The Policies are investment contracts rather than indemnity contracts.  First, they are either life insurance or accidental death policies, both of which are investment contracts.  See 16 Couch on Insurance § 222:27; 46A C.J.S. Insurance § 2027.  Second, that payment is fixed to a multiple of the insured's salary does not convert the Policies into indemnity policies.  As the Court noted at the hearing, federal employees can purchase life insurance structured in multiples of their salaries, and even Atlantic Specialty would not contend that life insurance policies are indemnity contracts.  See Tr. at 57:25-61:7 (Court, Johnson).  Atlantic Specialty's argument that the salary-dependent payout, the requirement of an accident, and New Mexico's wrongful death statute somehow combine to set its Policies apart is not convincing and lacks support in any cases.  See Tr. at 57:25-61:7 (Court, Johnson).  Taylor v. Greatway Insurance Co., the case Atlantic Specialty mentioned at the hearing as its closest case, examined whether Wis. Stat. Ann. § 631.43 allowed an insured to stack accidental death benefits from two automobile insurance policies.  See Taylor v. Greatway Ins. Co., 2000 WI App 64, ¶ 18, 608 N.W.2d 722, 728.  The Court of Appeals of Wisconsin distinguished cases dealing with equitable subrogation on the grounds that neither case "interprets Wis. Stat. Ann. § 631.43, nor do they have any application to the issue before us."  Taylor v. Greatway Ins. Co., 2000 WI App 64, ¶ 20, 608 N.W.2d 722, 729.  In short, Taylor v. Greatway Insurance Co. is irrelevant to "whether an insurer was entitled to equitable subrogation where a policy had no express subrogation clause," an issue that other

cases have addressed.  2000 WI App 64, ¶ 19, 718, 608 N.W.2d 722, 729 (citing <u>Cunningham v.</u>

<u>Metro. Life Ins. Co.</u>, 121 Wis. 2d 437, 360 N.W.2d 33).

Third, the Policies share important characteristics with investment contracts.  They do not

depend on any third party's action causing Breeden's death.  Breeden could have an accident by

himself -- such as a fall -- and still collect.  They provide for the payment of a set sum of money,

rather than indemnification of damages.  There is no indication that the Policy was "meant to

indemnify for the loss of Mr. Breeden's salary."  Letter at 2.  Although Breeden designated his

dependents as beneficiaries, he could have easily directed the proceeds to a charity or friend with

no need for compensation.  The policy did not base its payment on the actual value of his life or

even his likely earnings beyond nine years.  <u>See</u> <u>Amica Mut. Ins. Co. v. Maloney</u>, 1995-NMSC-

059, ¶ 9, 903 P.2d at 838 ("Ordinarily the right of subrogation allows an insurer <u>who has fully</u>

<u>compensated the insured</u> to step into the shoes of the insured and collect what it has paid from

the wrongdoer.")(emphasis added).

## B.     ALLOWING   EQUITABLE   SUBROGATION   IN   THIS   CONTEXT WOULD SUBVERT NEW MEXICO PUBLIC POLICY.

Adopting Atlantic Specialty's position would undermine New Mexico plaintiffs'

incentives to file wrongful death suits.  This case effectively illustrates the problems with its

proposal.  Atlantic Specialty seeks to recover "its payments" from the Defendants.  Atlantic

Specialty Insurance Company's Proposed Complaint in Intervention ¶ 52, at 8, filed November

25, 2015 (Doc. 67-2).  Any damages that it secures will, as a practical matter, reduce Hunt's

recovery.  Hunt noted during the hearing:

> [H]ad we known in advance and if there were a right to equitable subrogation for
> a million dollars and there was only a million dollars of insurance, we would
> advise the family probably not bring a wrongful death action because if all of the
> money is going back to Atlantic Specialty there would be no lawsuit[.]

Tr. at 70:10-16 (McGinn).  See In re Declaratory Ruling by N. Carolina Com'r of Ins. Regarding 11 N.C.A.C. 12.0319, 134 N.C. App. 22, 35, 517 S.E.2d 134, 143 (1999)("Restricting conventional subrogation provisions in insurance policies increases the amount of potential recovery for the insured public.").  The Court is skeptical that the New Mexico Legislature intended this result.  Moreover, if a decedent designated his accidental death insurance benefits to a friend or charity -- persons who are not statutory beneficiaries under the Wrongful Death Act -- an insurance company would be able to recoup that money through the wrongful death action.  The subrogation would deprive the "statutory beneficiaries of a benefit they never received." Hunt Response at 6 n.1.

Atlantic Specialty's counterarguments are unconvincing.  It urges the Court to "ensure that the alleged wrongdoers are held accountable for *all* losses they may have caused."  Reply at 5.  Although Atlantic Specialty paid benefits "as a result of Defendants' negligence," a life insurer could make the same argument.  Reply at 5.  Atlantic Specialty's protestations that interfering with Hunt's recovery "is not the intent of Atlantic" Specialty are irrelevant -- both of them are competing for the same share of limited resources.  Letter at 2.

**IT IS ORDERED** that Atlantic Specialty Insurance Company's Motion to Intervene as Plaintiff, filed November 25, 2015 (Doc. 67), is granted in part and denied in part.  Intervenor Plaintiff Atlantic Specialty Insurance Company is dismissed from this case with prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Richard L. Anderson
Price, Smith, Hargett, Petho & Anderson
Charlotte, North Carolina

-- and --

Randi McGinn
Michael Sievers
McGinn, Carpenter, Montoya & Love, PA
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Cody R. Rogers
Miller Stratvert, P.A.
Las Cruces, New Mexico

-- and --

Alyssa A. Johnson
Ryan L. Woody
Matthiesen, Wickert & Lehrer, S.C.
Hartford, Wisconsin

*Attorneys for the Intervenor Plaintiff*

S. Carolyn Ramos
Brett C. Eaton
Butt, Thornton & Baehr, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant North Carolina Logistics, Inc.*

Tim L. Fields
Alana M. De Young
Susana Miller Bisong
Modrall Sperling Roehl Harris & Sisk, P.A.
Albuquerque, New Mexico

*Attorneys for Defendant Sanvil Group Corp.*

Cord Borner
Atwood, Malone, Turner & Sabin, P.A.
Roswell, New Mexico

*Attorney for Defendant Leonardo R. Cabrera-Salgado*

Lance Dean Richards
Lawrence H. Hill
Megan Day Hill
Civerolo, Gralow, Hill & Curtis, P.A.
Albuquerque, New Mexico

     *Attorneys for Defendant Benito A. Oliva*

David W. Bunting
Seth Sparks
Tyler M. Cuff
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

     *Attorneys for Defendant Trans Delbuc, L.L.C.*

David W. Bunting
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

-- and --

Andrew W. Horn
Law Offices of Andrew W. Horn, P.A.
Miami, Florida

     *Attorneys for Defendant Antonio Delli Colli*